715 So.2d 387 (1998)
LOUISIANA SEAFOOD MANAGEMENT COUNCIL, et al.
v.
LOUISIANA WILDLIFE AND FISHERIES COMMISSION, et al.
No. 97-CA-1367.
Supreme Court of Louisiana.
May 19, 1998.
*388 Edmond Wade Shows, Richard Phillip Ieyoub, Attorney General, Frederick Whitrock, T. Michael Landrum, Ronnie J. Berthelot, Donald Edwin Puckett, Thomas E. Balhoff, Judith R.E. Atkinson, Baton Rouge, for Applicant.
Robert Alan Barnett, New Orleans, Paul R. Baier, Baton Rouge, for Respondent.
LEMMON, Justice.[*]
This is a direct appeal from a judgment of the trial court that declared unconstitutional several portions of Act No. 1316 of 1995, entitled the Louisiana Marine Resources Conservation Act and colloquially called the "gill net ban" law.[1]

Facts
Act 1316 of 1995 significantly restricted the use of gill nets by commercial fishermen in Louisiana waters. The principal limitations *389 were on the manner in which gill nets can be used. The Act restricts a commercial fisherman to the use of one "strike net"[2] and, after a two-year phase-in period, to the taking of mullets and pompano. And even for those species, the periods of time during which fish can be taken were significantly limited.
Attempting to block the implementation of Act 1316, plaintiffs[3] filed the instant class action against the Louisiana Wildlife and Fisheries Commission and the Department of Wildlife and Fisheries (DWF).[4] Plaintiffs asserted that Act 1316 is unconstitutional in its entirety based on numerous violations of state and federal constitutional provisions.
After a hearing, the trial court denied plaintiffs' request for a preliminary injunction, finding generally that the provisions of Act 1316 were constitutional. However, the court reserved judgment on the alleged commerce clause and takings clause violations until the trial of the permanent injunction.[5]
The trial court thereafter conducted a merits hearing on the permanent injunction. In reasons for judgment, the court concluded that the statutory provisions at issue violated both the takings clause and the commerce clause.[6] As to the takings clause, the court ruled that former La.Rev.Stat. 56:640.3 conferred on plaintiffs an incorporeal property right to fish commercially[7] and that the 1995 amendment to that statute constituted an "outright constructive repeal" of the right to fish commercially.[8] Having found plaintiffs *390 possessed an incorporeal right that was extinguished by Act 1316, the trial court turned to the question of whether that extinguishment was a constitutional taking.
The trial court applied the three-pronged test enunciated in State Through Dep't of Transp. and Dev. v. Chambers Inv. Co., 595 So.2d 598 (La.1992) for determining whether compensation is due for the taking of an incorporeal right.[9] Addressing whether Act 1316 affected the plaintiffs' right to fish commercially, the court observed:
In this case, the petitioners who were licensed to fish commercially [and all others who were permitted to fish commercially] prior to the enactment of Act. No. 1316, § 2 which amended this statute, had the vested right, to fish commercially. Having been invested with that right, the commercial fishermen then proceeded to purchase the necessary legal gear and boat(s) to exercise that right. Several of these commercial fishermen invested thousands of dollars with the understanding, as expressed in the law, that their gear would not be later declared illegal without biological data showing that a previously legal method of harvesting fish was damaging a particular species of fish.
Act 1316 eliminated the use of gill nets in state waters. This previously legal method of harvesting fish was declared illegal without any supporting biological data showing that the gill nets were damaging a particular species of fish. Consequently, the petitioners who are commercial fishermen and who had invested in gill nets had their right to fish commercially affected. (emphasis added).
Turning to the second inquiry of whether the property right has been taken or damaged in a constitutional sense, the trial court commented that the result of Act 1316's rendering illegal the use of gill nets was that "several of the commercial fishermen lost most, if not all, of their business." Continuing, the court noted that "[t]o offset their losses, the State, through Act 1316, offered to buy back some of their gear and/or extend educational opportunities to these commercial fishermen with the precondition that they would surrender their right to fish commercially." Given this, the court concluded that the property right to fish commercially had been taken or damaged in a constitutional sense.
On the final inquiry of whether the taking was for a public purpose under La. Const. art. I, § 4, the trial court, citing the express legislative language that the purpose of Act 1316 was "to promote the enhancement of Louisiana's marine resources by the removal of indiscriminate entanglement nets from coastal waters," concluded that this clearly was a public purpose.
Since the three-prong Chambers test was satisfied, the trial court then examined Section 13.1 of Act 1316, which provides for buy-back of gill nets and for training of certain qualified applicants, to determine whether these programs constituted just compensation *391 to the commercial fishermen. Labeling Section 13.1's provisions "woefully inadequate," the court reasoned:
The "buy back" and training provisions of the Act are woefully inadequate and fail to justly compensate the commercial fishermen. For instance, in arbitrarily restricting the eligibility of those applicants for economic assistance to those who had purchased a gill net license in at least two of the years between 1993 and 1995, Act 1316 provides no compensation to all those who had been conferred the incorporeal right to fish commercially and who had been permitted to fish commercially since 1986, but who did not purchase a gill net license in two of the years between 1993 and 1995. Additionally, the "buy back" and training provisions fail to justly compensate those who qualified for economic assistance under the Act because the Department of Wildlife and Fisheries has failed to allocate any money for the purchase of the formerly legal gear.
The trial court thus concluded that Section 13.1 violated La. Const. art. I, § 4's prohibition against taking property without just compensation. Further concluding that Section 13.1 is severable from the remainder of Act 1316, the court permanently enjoined the Department from enforcing Section 13.1 and ordered the defendant State of Louisiana to "justly compensate the commercial fishermen who were either licensed or permitted to fish commercially when Act 1316 went into effect... for all previously legal gear and equipment they had purchased in the exercise of their previously legislatively conferred incorporeal right to fish commercially."
Plaintiffs thereafter applied for a new trial. In granting the motion in part, the trial court expressly noted that it had not addressed several sections of Act 1316, the enforcement of which a federal district judge had already enjoined. Inasmuch as the federal court had dissolved its injunction after the ruling on the permanent injunction in this case, the trial court found it appropriate to address plaintiffs' claims regarding these other provisions of the Act.
Although rejecting on the merits plaintiffs' attacks on other provisions of the Act, the trial court found the commercial rod and reel licensing provision of Section 305B(14)(a) unconstitutional. In so doing, the court reasoned:
Under § 305(B)(14)(a) of Act 1316, to be eligible for a commercial rod & reel license, an applicant must have acquired a gill net license in two of the past three years. Prior to the enactment of Act 1316, there was no such requirement on rod & reel fishermen.
Upon a review of the evidence, this Court is of the opinion that the "Commercial Rod & Reel Fishermen" licensing requirement provision of § 305(B)(14)(a) lacks any rational basis. Absolutely no evidence was introduced by the defendants and intervenor which justified the new classification of commercial fishermen. Hence, this Court concludes as the federal court did, that "[E]xclusion of past rod and reel fishermen simply because they did not possess a gill net license strikes this Court as either a mistake in the statute or a completely arbitrary classification." Louisiana Seafood Management Council, Inc. v. Foster, 917 F.Supp. 439, 446 (E.D.La.1996).
Also reaffirming its prior holding, the trial court added Section 305B(14)(a) to the list of sections permanently enjoined.
From the trial court's decision, both sides appealed. Plaintiffs' appeal, contending that Act 1316 is unconstitutional in its entirety, is presently pending in the court of appeal. Defendants' appeal contesting the district court's declaration of unconstitutionality of certain sections of the Act, falls within the ambit of this court's appellate jurisdiction.[10] La. Const. art. V, § 5(D).

Takings Clause
The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, *392 without just compensation." The Louisiana Constitution likewise provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.
La. Const. art. I, § 4.
An analysis of the takings clause issue requires an inquiry into the nature of the property interest alleged to have been taken. In the particular context of the gill net restrictions, fishermen in several states have unsuccessfully advanced three theories: (1) that they have a property right in the fish; (2) that their gear or other capital investment has been "taken;" or (3) that they have a property right in the "right to fish." Christopher L. Koch, A Constitutional Analysis of Limited Entry, in Limited Entry as a Fishery Management Tool 251, 265 (1978) (noting that "[n]one of these theories would seem to have a significant chance of success.")
The lack of any property interest in the fish in the waters is well-settled, statutorily and judicially. See La. Civ.Code arts. 450, 452; La.Rev.Stat. 56:3. In LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370 (E.D.La.1978), the court explained that "fish which are at large in state waters are the property of the state, as public or common things;" that "an individual has no proprietary interest in the fish he is prevented from catching;" and that "an individual has no proprietary right to fish commercially in state waters." 444 F.Supp. at 1378. Fishermen's inability to establish a private property interest in free-swimming corporeal fish has precluded recovery under this theory. Douglas F. Britton, The Privatization of the American Fishery: Limitations, Recognitions, and the Public Trust, 3 Ocean & Coastal L.J. 217, 236 (1997) (noting that under these circumstances fishermen have been regarded as "possessing no compensable, or prosecutable, property interests" for takings claims purposes).
As to the taking of capital investment, both sides agree that Act 1316 has not deprived plaintiffs of their gear or other capital investments, but has restricted them from the most profitable use of their gill nets. However, "[g]overnmental regulationby definitioninvolves the adjustment of private rights for public benefit. To require compensation whenever the law curtailed the potential for economic exploitation `would effectively compel the government to regulate by purchase.'" Laurence H. Tribe, American Constitutional Law 596-97 (2d ed.1988) (quoting Andrus v. Allard, 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979) (emphasis in original)). As a result, economic restraints generally do not rise to the level of a taking because, in the oft-quoted words of former Justice Holmes, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).
A licensed commercial fisherman generally has no proprietary right in exercising his fishing license, but merely has a state-granted privilege subject to such limitations as the state may impose in the exercise of its police power. LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370, 1382 (E.D.La.1978). Further, while a licensed commercial fishermen has a proprietary interest in the use of his boats and nets, that interest is subject to restriction by the state pursuant to its power to regulate the taking of fish in public waters. Id. Indeed, the takings clause of the state constitution expressly provides that the state has the right in the exercise of its police powers to impose reasonable regulations on private property. La. Const. art. I, § 4.
Plaintiffs argue that the Act diminished the economic value of their equipment, but a similar argument was rejected in Andrus v. Allard, 444 U.S. 51, 65, 100 S.Ct. 318, 326-27, 62 L.Ed.2d 210 (1979). The court stated that "loss of future profitsunaccompanied *393 by any physical property restriction provides a slender reed upon which to rest a taking claim.... [T]he interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." 444 U.S. at 66, 100 S.Ct. at 327.
Other courts have rejected the argument that a regulatory taking results from the banning or restricting the use of gill nets. In LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 289 So.2d 150 (La.1974), this court rejected the argument that restrictions on the use of gill nets made fishermen's investments in their boats and nets useless and amounted to a loss of a property right, reasoning that "[i]t may be that the boat may not be used with gill nets in the designated waters; however, the statute does not prohibit the use of the boat in these waters for fishing without gill nets, or, for that matter, with gill nets in nearby or adjoining waters." 289 So.2d at 153.
In Lane v. Chiles, 698 So.2d 260 (Fla.1997), the court recently rejected a similar takings clause challenge to Florida's amendment banning gill nets, reasoning:
"[T]he amendment does not prohibit all possible uses for the property and equipment in question. State statutes that limit fishing seasons, restrict permitted gear, and define certain zones for particular activities have been upheld.... [R]estrictions on the harvest of marine fish does not constitute a taking of property from particular individuals."
698 So.2d at 264. See also Burns Harbor Fish Co. v. Ralston, 800 F.Supp. 722 (S.D.Ind.1992), in which the court reasoned:
[T]he state merely forbids Burns Harbor from using gill nets within the confines of Indiana waters of Lake Michigan. All indications are that Burns Harbor still has dominion and control over its gill nets. Burns Harbor can sell its nets, it can put them to other uses, it can fish with them outside of Indiana waters. Indeed, it can do virtually anything it wants with its nets except use them to fish in Indiana waters. While the ban on gill net fishing prevents Burns Harbor from obtaining economic benefit from its nets when fishing in Indiana waters, the State's regulation cannot be considered a taking of the gill nets because the State of Indiana by regulating gill net fishing is simply exercising its sovereign right and responsibility to oversee and regulate the environment and wildlife within the State.
800 F.Supp. at 726.
Plaintiffs distinguish this case from the above line of cases. Pointing to the Legislature's enactment in 1986 of a commercial "right to fish" law, plaintiffs forcefully argue that they have a justifiable investment-backed reliance interest in the right to fish.[11]
As plaintiffs acknowledge, the issue at the crux of this case is whether commercial fishermen were vested in 1986 with an incorporeal right to fish with currently legal methods unless biological data supports an alteration of that right.
Defendants contend that the 1986 act was permissive legislation which simply set forth a policy statement suggesting that the Legislature "should" seek a recommendation from the Department when contemplating the alteration of any legal method of fishing commercially. Noting that the original draft of the statute mandated the Legislature to seek such a recommendation, but that the bill was reworded during the legislative process to provide that the Legislature "should" do so, defendants argue that this rewording made the legislation directory rather than mandatory.
In counter arguments, plaintiffs first contend that the title of the 1986 act indicated an intent "to limit legislative action"; "to require biological data furnished by the Department of Wildlife and Fisheries prior to action on legislation" and "to protect fisheries operations." Plaintiffs thus contend that the statute must be construed as mandatory to avoid a violation of title-object requirement of La. Const. art. III, § 15(A), which *394 provides that "[e]very bill shall contain a brief title indicative of its object." We disagree.
This court has consistently construed the title-object requirement broadly as serving the purpose of giving "fair notice" to the Legislature and the public of the scope of legislation and thereby preventing the deceptive practice of misleading the Legislature into passing provisions not indicated by the title of the bill. Orleans Parish School Board v. City of New Orleans, 410 So.2d 1038 (La.1982). Courts through the years have held a statute void only when the variance in the provisions of the act is palpable and totally irreconcilable with its title, or when both title and body express two distinct subjects. Gordon Kean, The Title-Body Clause and the Proposed Statutory Revision, 8 La. L.Rev. 113, 114 (1947). Moreover, the current constitution seems to suggest more flexibility in the title-object requirement because "added was the reference ... to a `brief title.'" Lee Hargrave, The Louisiana Constitution: A Reference Guide 55 (1990).
We conclude that construing the word "should" as permissive does not violate the title-object requirement. The lengthy title (which is not enacted into law), while indeed including mandatory language, is not inconsistent with the object of the statute, as finally enacted, of advising, but not requiring, the Legislature to seek the Department's recommendation.
Plaintiffs further contend that the verb "should" is the past tense of the verb "shall," citing in support the definition of "should" as "was obliged to;" "past of SHALL" in Webster's New Collegiate Dictionary 1065 (1979).
The modern rule rejects this "arcane" meaning and instead defines "should" as "the weaker companion to the obligatory `ought.'" State v. Thomas, 528 So.2d 1274, 1275 (Fla. 3d DCA 1988) (citing Texas & P. R. Co. v. Consolidated Companies, 180 La. 180, 187, 156 So. 215, 217 (1934), in which this court ruled "[t]he word `should' in the rule which the plaintiff invokes is directory. Being directory, a deviation is excusable under proper circumstances.") A similar definition of "should" appears in Byran A. Garner, A Dictionary of Modern Legal Usage 396 (1987), which provides:

Ought should be reserved for expressions of necessity, duty, or obligation; should, the weaker word, expresses mere appropriateness, suitability, or fittingness.
The modern view is that "`should' generally denotes discretion and should not be construed as `shall.'" 3 Norman J. Singer, Sutherland Statutory Construction § 57.03 (5th Ed.1992). Furthermore, "when a statute is amended and the shift in language is from `shall' to `may' there is clear manifestation of intent that the statute be permissive." Id. Still further, "[w]here both mandatory and directory verbs are used in the same statute, or in the same section, paragraph, or sentence of a statute, it is a fair inference that the legislature realized the difference in meaning, and intended that the verbs used should carry with them their ordinary meanings." Id. at § 57.11.
Applying those principles, we conclude that the Legislature's use of the word "should" was clearly intended to be permissive. Not only was the statute reworded from "shall" to "should" in the legislative enactment process, but also the statute itself contains the word "should" in three places referring to the Legislature and the word "shall" in three places referring to the Department. This use of both mandatory and directory verbs scattered throughout this statute clearly evidences the Legislature's intent to differentiate the meaning of the terms.
In sum, we conclude that former La.Rev. Stat. 56:640.3 was merely a hortatory provision directing that the Legislature, as a policy matter, seek a recommendation from the Department. While a mandatory requirement of biological data to suggest a legislative change in fishing methods might have been a wiser policy decision, the prudence of the 1986 legislation is not before the court. Plaintiffs' arguments are persuasive, but the underlying premise for the trial court's holding that plaintiffs possessed a vested incorporeal right to fish commercially is legally erroneous. Accordingly, Act 1316 did not result *395 in a taking of any property rightcorporeal or incorporealpossessed by plaintiffs.[12]

Equal Protection
The trial court declared unconstitutional on equal protection grounds the requirement set forth in La.Rev.Stat. 56:305B(14)(a) that applicants for a commercial rod and reel license "must provide positive proof that they held a valid commercial gear license for gill nets during any two years of the years 1995, 1994, and 1993."
The first step in the analysis of this issue is to define the appropriate level of constitutional scrutiny. Given the economic nature of the gear licensing regulation at issue, we conclude that the rational basis standard applies. See Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96); 668 So.2d 1135, 1143 (noting that the "rational basis standard traditionally [is] applied to legislation involving economics and social welfare" and police power); see also Lane v. Chiles, 698 So.2d 260 (Fla.1997) (because fishing is not a fundamental right and commercial fishermen do not constitute a suspect class, the rational basis test applies); LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370, 1382 (E.D.La. 1978); City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding a ban on pushcart vendors in the French Quarter, along with a grandfather provision, under the rational basis standard).
Under the rational basis standard, great deference is given to legislative determinations. A classification is constitutional if it has some reasonable basis. A classification "does not offend the constitution simply because [it] is not made with mathematical nicety or because in practice it results in some inequality." Bazley v. Tortorich, 397 So.2d 475, 484 (La.1981).
The apparent purpose of the new rod and reel license is to mitigate the hardship caused by Act 1316 on former gill netters by allowing an alternative means of commercial fishing for those who previously used gill nets. This type of licensing restriction places a moratorium on the licensing of new entrants into the state fisheries. See John A. Duff and William C. Harrison, The Law, Policy, and Politics of Gillnet Restrictions in State Waters of the Gulf of Mexico, 9 St. Thomas L.Rev. 389, 397 n. 78 (1997) (noting the similarity between the Louisiana and Alabama provision which both contain this type of requirement of prior gill net licenses). Given the mitigatory aim of the rod and reel provision in general, coupled with the specific pragmatic purpose of this requirement to restrict entry into the commercial fisheries market, we conclude the classification has a rational basis and reverse the district court's finding of unconstitutionality.

Decree
Accordingly, the judgment of the trial court, declaring La.Rev.Stat. 56:13.1 and La. Rev.Stat.56:305B(14)(a) unconstitutional and permanently enjoining the enforcement of those provisions, is reversed.
NOTES
[*] Kimball, J., not on panel, recused. Rule IV, Part II, § 3.
[1] La. Acts 1995, No. 1316, amended and reenacted significant sections of Title 56 of the Revised Statutes.
[2] A strike net is a gill net which is not attached to the bottom and which is actively fished.
[3] The plaintiffs are licensed commercial saltwater fishermen, associations composed of commercial fishermen, commercial seafood marketing interests, seafood wholesalers, seafood retailers, restaurateurs who sell seafood, and seafood consumers.
[4] The Coastal Conservation Association, d/b/a Gulf Coast Conservation Association of Louisiana (GCCA), permissively intervened.
[5] Particularly, the court reserved decisions on (1) whether the significant restrictions on the use of gill nets and the gill net buy-back program violate the takings clause of both the federal and state constitutions, and (2) whether Act 1316's provisions regarding the traversal and per net fee for fishing in the federal exclusive economic zone ("EEZ"), La.Rev.Stat. 56:305B(4)(b) and 305.5B, as amended by Act 1316, violate the federal commerce clause.
[6] The parties virtually concede that the Legislature's 1997 repeal of La.Rev.Stat. 56:305B(4)(b) and amendment of La.Rev.Stat. 56:305.5B renders the commerce clause issue moot. We therefore do not address this issue.
[7] Prior to Act 1316 of 1995, La.Rev.Stat. 56:640.3 provided:

A. The legislature recognizes that legal methods to harvest any species of fish should not create a severe economic and personal hardship on the fishermen using said method. The legislature thereby declares that restrictions on legal methods to harvest finfish, shrimp, oysters, crabs, or any other species of fish should be recommended by the Louisiana Department of Wildlife and Fisheries.
B. The department shall recommend the elimination of a presently legal method to harvest fish only if any species of fish affected by that harvesting method will be damaged without the elimination of that method. The department shall base its recommendation on biological data which may be obtained by any method and from any source the department deems appropriate.
C. Upon introduction of any instrument which eliminates a legal method to harvest fish commercially, the House or Senate Committee on Natural Resources should request a recommendation from the department. The department shall present a recommendation to the committee based on its findings from the biological data no later than the opening of the next regular session of the legislature.
[8] As amended by Act 1316, La.Rev.Stat. 56:640.3 presently provides:

A. The legislature recognizes that under the public trust doctrine the marine fishing resources, among other natural resources, are managed by the state in trust for the benefit of all its citizens.
B. The legislature also recognizes that all citizens of the state have a right to fish in and otherwise enjoy marine waters as long as they are in compliance with current licensing requirements. Furthermore, conservation and management decisions shall be fair and equitable to all the people of the state and implemented in such a manner that no individual, corporation, or other entity acquires an excessive share of such rights and privileges. The right to fish does not convey any property right or ownership in the fishery resource, but rather recognizes continued public access to fishing opportunities in marine waters.
C. The legislature further recognizes that the state's marine fishery resources require proper management in order to be sustained biologically and to continually produce a maximum yield of social and economic benefits. To this end, restrictions on legal fishing methods to harvest finfish, shrimp, oysters, crabs, and other marine fish species may become necessary.
D. The department shall recommend the elimination or restriction of any fishing gear currently in use or which may be used in recreational or commercial fisheries in implementing its management responsibilities or in response to any emergency situation. While elimination or restriction may have uneven impacts on different groups of fishermen, the proposed measures should be applicable to all people of the state. In addition to acquiring the best available biological data, the department shall use all practicable means to collect all relevant social and economic data in support of such allocation decisionmaking efforts.
[9] Noting the need for a "firm framework" of analysis for dealing with the taking of legal property rights as opposed to tangible concrete objects, this court enunciated the following three-pronged test for doing so in Chambers:

Under this analysis, we must first determine if a person's legal right with respect to a thing or an object has been affected.... Second, if it is determined that property is involved, we must decide whether the property, either a right or a thing, has been taken or damaged, in a constitutional sense. If property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question then is whether the taking or damaging is for a public purpose under Article I, § 4. (emphasis in original).
595 So.2d at 603.
[10] The parties filed two motions seeking to consolidate this case with the appeal currently pending in the court of appeal. The first motion was denied. The second motion, filed after oral arguments, was referred to the merits and is hereby denied.
[11] Indeed, the trial court differentiated this state from the "rest of the Union" because "the State of Louisiana, through its Legislature, conferred upon the commercial fishermen of this State the right to fish commercially in 1986" in La.Rev. Stat. 56:640.3 prior to its "revision or amendment or outright constructive repeal by Act 1316."
[12] While plaintiffs obliquely suggest that the Legislature's inclusion of mitigatory measures in Act 1316 was an acknowledgment of a compensable taking, other states have likewise included such buy-back provisions in their gill net regulations despite the lack of any legal mandate compelling them to do so. See Christopher L. Koch, A Constitutional Analysis of Limited Entry, in Limited Entry as a Fishery Management Tool 251, 266 (1978)(noting that despite the lack of a legal obligation to compensate harmed fishermen, a legislature may nonetheless deem it appropriate to include a buy-back program to assist economically dislocated fishermen); Alexandra M. Renard, Will Florida's New Net Ban Sink or Swim?: Exploring the Constitutional Challenges to State Marine Fishery Restrictions, 10 J. Land Use & Envtl. L. 273, 290 (1995)(noting states "politically sensitive to these hardships" have included such mitigatory measures).