719 So.2d 119 (1998)
LOUISIANA SEAFOOD MANAGEMENT COUNCIL, et al.
v.
LOUISIANA WILDLIFE AND FISHERIES COMMISSION, et al.
No. 97 CA 1344.
Court of Appeal of Louisiana, First Circuit.
September 1, 1998.
Rehearing Denied November 2, 1998.
*121 Robert Barnett, New Orleans, Paul Baier, Baton Rouge, for Plaintiffs/Appellants Louisiana Seafood Management Council, et al.
Frederick Whitrock, T. Michael Landrum, E. Wade Shows, Baton Rouge, for Defendants/Appellees State of Louisiana, Department of Justice, Wildlife & Fisheries Commission, Wildlife & Fisheries Department.
Thomas Balhoff, Baton Rouge, for Intervenor/Appellee Coastal Conservation Association, d/b/a Gulf Coast Conservation Association.
*122 Before FOIL and KUHN, JJ. and CHIASSON[1], J. Pro Tem.
KUHN, Judge.
By judgment dated February 18, 1997, the trial court permanently enjoined several portions of Act 1316 of the 1995 Regular Session of the Louisiana Legislature ("Act 1316"), entitled the Louisiana Marine Resources Conservation Act and colloquially called the "gill net ban" law.[2] The remainder of Act 1316 was determined to be constitutional. This is an appeal by plaintiffs from that portion of the judgment which concludes the remainder of Act 1316 is constitutional and which denies permanent injunctive relief. We affirm.

PROCEDURAL AND FACTUAL BACKGROUND
Plaintiffs consist of licensed commercial saltwater fishermen, associations composed of commercial fishermen, commercial seafood marketing interests, seafood wholesalers, seafood retailers, restaurateurs who sell seafood, and seafood consumers. On August 11, 1995, plaintiffs filed a petition seeking injunctive and declaratory relief, averring that Act 1316 was unconstitutional under both the Louisiana and the United States Constitutions. Plaintiffs additionally requested certification of the lawsuit as a class action.[3] Accompanying the petition was a request for a temporary injunction seeking to restrain defendants, the Department of Wildlife and Fisheries ("DWF") and the Louisiana Wildlife and Fisheries Commission ("the Commission"), from enforcing the provisions of Act 1316. The trial court signed the judgment ordering the temporary injunction on August 14, 1995, and set the hearing for a preliminary injunction for August 31, 1995. During the interim, Coastal Conservation Association d/b/a Gulf Coast Conservation Association, permissively intervened in the litigation. After adducing evidence at the hearing for the preliminary injunction, the trial court denied the plaintiffs the requested relief.[4]
A two-day trial on the merits for the permanent injunctive relief commenced on February 27, 1996. By judgment dated June 19, 1996, the trial court permanently enjoined inter alia § 13.1 of Act 1316, concluding these provisions were unconstitutional.[5] *123 Thereafter, plaintiffs filed a motion for a partial new trial. On February 18, 1997, the trial court signed a judgment concluding § 305 B(14)(a) of Act 1316 likewise was unconstitutional. In all other respects, the trial court found Act 1316 to be constitutional. The trial court severed §§ 13.1 and 305 B(14)(a) from the remainder of the act, and denied plaintiffs further injunctive relief as to the remaining provisions. A direct appeal from that portion of the judgment declaring unconstitutional the several provisions of Act 1316 was taken to the Louisiana Supreme Court.[6] This appeal addresses plaintiffs' contentions relative to the remaining portion of Act 1316, which the trial court concluded was constitutional.

The Louisiana Supreme Court's Determination
On May 19, 1998, the Louisiana Supreme Court issued an opinion reversing the trial court's conclusion that §§ 13.1 and 305 B(14)(a) of Act 1316 were unconstitutional. Louisiana Seafood Management Council v. Louisiana Wildlife and Fisheries Comm'n, 97-1367 (La.5/19/98); 715 So.2d 387. The Supreme Court explained the provisions of Act 1316 as follows.
Act 1316 of 1995 significantly restricted the use of gill nets by commercial fishermen in Louisiana waters. The principal limitations were on the manner in which gill nets can be used. The Act restricts a commercial fisherman to the use of one "strike net" [a gill net which is not attached to the bottom and which is actively fished] and, after a two-year phase-in period, to the taking of mullets and pompano. And even for those species, the periods of time during which fish can be taken were significantly limited. (Footnote incorporated into quoted text.)
Id. at pp. 1-2; 715 So.2d at 389.
Addressing the issue of whether the trial court erred in its conclusion that § 13.1 of Act 1316 violated the prohibition against the taking of property without just compensation set forth in Art. 1, § 4 of the Louisiana Constitution, the Supreme Court noted, "The lack of any property interest in the fish of the waters is well-settled, statutorily and judicially." Id. at p.8; 715 So.2d at 392. The court rejected plaintiffs' theory that the gill net restrictions imposed by Act 1316 amounted to a taking of capital investment, explaining that "economic restraints generally do not rise to the level of a taking." Id. Turning to the assertion by plaintiffs that the Legislature's enactment in 1986 of a commercial "right to fish" gave them a justifiable investment-backed reliance interest in the right to fish, the Supreme Court examined the provisions of La. R.S. 56:640.3, as enacted in 1986. Framing the issue as "whether commercial fishermen were vested in 1986 with an incorporeal right to fish with currently legal methods unless biological data supports an alteration of that right," the Supreme Court held that they were not so vested. Because the trial court erroneously premised its conclusion that § 13.1 of Act 1316 was in violation of La. Const. Art. 1, § 4 on the finding that plaintiffs possessed a vested incorporeal right to fish commercially, the Supreme Court determined that Act 1316 did not result in the taking of any property right possessed by the plaintiffs, and reversed the trial court's declaration that § 13.1 was unconstitutional. Id. at p.13; 715 So.2d at 394. Thus, the Supreme Court concluded that plaintiffs were not entitled to any compensation for their displacement by the restrictions to gill net use contained in Act 1316.[7]
The Supreme Court also reviewed the trial court's conclusion that the requirement set forth in § 305 B(14)(a) of Act 1316 (that applicants for commercial rod and reel licenses must provide positive proof that they held a valid commercial gear license for gill nets during any two of the years 1995, 1994, and 1993) was unconstitutional on equal protection grounds. In reversing the trial court, *124 the Supreme Court held that the appropriate level of constitutional scrutiny was the rational basis standard, noting that the licensing regulation at issue is of an economic nature. Id. at p.14; 715 So.2d at 395. Finding that the apparent purpose of the new rod and reel license is "to mitigate the hardship caused by Act 1316 on former gill netters by allowing an alternative means of commercial fishing for those who previously used gill nets," the Supreme Court concluded the classification contained in § 305 B(14)(a) has a rational basis. The trial court's ruling to the contrary was reversed. Id. at p.15; 715 So.2d at 395.
Against this backdrop, we turn to those contentions raised in this appeal which remain viable in the wake of the Supreme Court's reversal of the trial court's declaration that several portions of Act 1316 were unconstitutional.

ISSUES
The issues raised by plaintiffs in this appeal are as follows.
(1) Whether Act 1316 violates Article IX, § 1 (the Public Trust Doctrine) of the Louisiana Constitution;
(2) Whether Act 1316 violates the Commerce Clause of the United States Constitution; and
(3) Whether Act 1316 denies plaintiffs due process and equal protection of the laws.

PUBLIC TRUST DOCTRINE
Article IX, section 1 of the Louisiana Constitution sets forth this state's Public Trust Doctrine and provides:
The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety and welfare of the people. The legislature shall enact laws to implement this policy.
Plaintiffs assert that Louisiana's Public Trust Doctrine mandates equitable distribution of the saltwater finfish resources among fishermen, and that the failure of the Legislature to produce evidence demonstrating that the enactment of Act 1316 was based upon careful scientific investigation of the best scientific information available amounts to a violation of Art. IX, § 1 of the Louisiana Constitution. Buttressing this assertion with the provisions of La. R.S. 56:640.3 prior to its amendment by Act 1316, plaintiffs contend commercial fishermen were vested with an incorporeal right to fish using currently legal methods of harvesting fish unless biological data supports an alteration of that right.
Prior to the enactment of Act 1316, La. R.S. 56:640.3 provided:
A. The legislature recognizes that legal methods to harvest any species of fish should not create a severe economic and personal hardship on the fishermen using said method. The legislature hereby declares that restrictions on legal methods to harvest finfish, shrimp, oysters, crabs, or any other species of fish should be recommended by the Louisiana Department of Wildlife and Fisheries.
B. The department shall recommend the elimination of a presently legal method to harvest fish only if any species of fish affected by that harvesting method will be damaged without the elimination of that method. The department shall base its recommendation on biological data which may be obtained by any method and from any source the department deems appropriate.
C. Upon introduction of any instrument which eliminates a legal method to harvest fish commercially, the House or Senate Committee on Natural Resources should request a recommendation from the department. The department shall present a recommendation to the committee based on its findings from the biological data no later than the opening of the next regular session of the legislature.
(Footnote omitted.)
In conjunction with plaintiffs' contention that Act 1316 amounted to the taking of their property by the state without just compensation, the Louisiana Supreme Court examined the provisions of § 640.3. Reversing the trial court's determination that § 640.3 vested *125 plaintiffs with an incorporeal right to fish commercially, the Supreme Court rejected plaintiffs' assertion that the statute mandated the Legislature to seek a recommendation, based on biological data, from DWF prior to the alteration of any legal method of fishing, Louisiana Seafood Management Council, 97-1367 at p.11; 715 So.2d at 393, and concluded former § 640.3 was "merely a hortatory provision directing that the Legislature, as a policy matter, seek a recommendation from [DWF]." Id. at p.13; 715 So.2d at 394. Thus, former § 640.3 did not require the Legislature to produce evidence based on biological data prior to enacting Act 1316, which undisputedly altered the legal methods of commercial fishing.
Plaintiffs maintain that La. R.S. 56:638.1-638.5 evinces the Legislature's previous recognition of "its Public Trust stewardship of Louisiana's saltwater finfish resources." In so contending, plaintiffs suggest that the purposes, policy and standards set forth in La. R.S. 56:638.3-638.5 are "part and parcel of Louisiana's Public Trust Doctrine," and urge that the Legislature in enacting Act 1316 failed to adhere to those statutory provisions in furtherance of its duty to implement the Public Trust Doctrine.
We note initially that Art. IX, § 1 mandates that the natural resources of this state be protected, conserved, and replenished. To this end, Article IX, § 1 directs the Legislature to implement laws in furtherance of this mandate "consistent with the health, safety and welfare of the people." In order to fulfill the mandate of the Public Trust Doctrine, given the very nature of use of natural resources, the Legislature may find it necessary from time to time to make adjustments to previously-enacted laws in response to the changes in the variations of natural resources resulting from the use or conservation of those resources. In enacting Act 1316, we are convinced the Legislature simply revisited its constitutional duty set forth in Art. IX, § 1 in light of the adjusted levels of the natural resources (in this case saltwater finfish) which resulted from the use of those resources in conformity with earlier laws and enacted the legislation with the purpose of protecting and replenishing this natural resource.
We turn now to plaintiffs' contention that the Legislature is bound to adhere to the purposes, policies and standards set forth in Sections 638.3-638.5. Clearly, the respective mandates contained in the plain language of §§ 638.3 and § 638.5[8] are expressly directed *126 to the Commission. Thus, plaintiffs' reliance on either of these statutes to buttress their assertion that the Legislature's enactment of laws in furtherance of the mandate contained in Art. IX, § 1 is constrained by these statutory provisions is misplaced.
Louisiana Revised Statutes 56:638.4, entitled "Policy," states:
The policy of the state of Louisiana is hereby declared to be the following:
Stewardship of the state's saltwater finfish resources shall have as its utmost concern the continued health and abundance of the resource and its environs, shall provide for optimum sustained benefits to the state, shall be responsive to the needs of interested and affected citizens, shall ensure the proper and fair utilization of these resources for citizens of the state in present and future generations, shall preserve the state's exclusive right to manage the fisheries within or beyond its jurisdiction, and shall be based on the best scientific information available. In addition, such stewardship of the state's saltwater finfish resources shall draw upon federal, state, and academic capabilities and promote efficiency in carrying out research, administration, management, and enforcement.
The entirety of Subpart L of Part VII of Title 56, which contains § 638.4, was enacted by Acts 1991, No. 708, § 1. Given the placement of § 638.4 in Subpart L of Part VII of Title 56 and reading Subpart L as a whole, we are convinced that § 638.4 is likewise directed to the Commission.
Moreover, we are mindful of Louisiana Civil Code article 13 instructing that laws on the same subject matter must be interpreted in reference to each other. Louisiana Revised Statutes 56:3 states that "ownership and title to all ... fish are and remain the property of the state, and shall be under the exclusive control of the [Commission]...." Reading § 3 in pari materia with § 638 .4, it is evident that the stewardship directive of § 638.4 is addressed to the Commission. In a tripartite system of government, the powers of the three branches are separate: the legislature enacts laws, the executive executes laws, and the judiciary applies laws. Murrill v. Edwards, 613 So.2d 185, 189 (La.App. 1st Cir.), writ denied, 614 So.2d 65 (La.1993). The control and supervision of the wildlife of the state, including all aquatic life, is vested in the Commission, which is within the executive branch of government. La. Const. Art. IX, § 7; La. R.S. 36:601; La. R.S. 56:1. Stewardship is defined as "the careful responsible management of something ... entrusted to one." Webster's Third New International Dictionary 2240 (1993). We find the concept of stewardship inconsistent with the function of the Legislature. This interpretation, concluding that § 638.4 is directed to the Commission rather than to the Legislature, harmonizes any possible conflict with § 3 when the two statutes are read in pari materia, and is congruent with the express mandate that the Legislature "shall enact laws" in furtherance of the policy set forth in Art. IX, § 1[9].

*127 COMMERCE CLAUSE
The Commerce Clause of the United States Constitution provides, "The Congress shall have Power ... To regulate Commerce... among the several States ..." and reflects a central concern of the Framers to the Constitution: "the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." See H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 533-34, 69 S.Ct. 657, 662-63, 93 L.Ed. 865 (1949). The Commerce Clause has accordingly been interpreted not only as authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation. Hughes v. Oklahoma, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979).
Plaintiffs contend the evidence shows that through its enactment of Act 1316, the state of Louisiana has imposed a substantial burden on interstate and foreign commerce without any showing of a real and legitimate conservation purpose, and as such "is bad under the Commerce Clause" of the Constitution of the United States.
When legislating in areas of legitimate local concern, such as environmental protection and resource conservation, states are nonetheless limited by the Commerce Clause. Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981). The United States Supreme Court has articulated that under the general rule governing Commerce Clause challenges, we must inquire (1) whether the challenged legislation regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the legislation serves a legitimate local purpose; and if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. Id., 441 U.S. at 336, 99 S.Ct at 1736.
The "incidental burden on interstate commerce" appropriately considered in a Commerce Clause analysis is the degree to which the state action incidentally discriminates against interstate commerce relative to intrastate commerce. It is a comparative measure. Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 406 (3d Cir.1987). Where the burden on out-of state interests is no different from that placed on competing in-state interests, it may be said to be a burden on commerce, rather than a burden on interstate commerce. Id. at 406. The Commerce Clause is concerned with protectionism and the need for uniformity and legislation will not be invalidated in the absence of discriminatory burdens on interstate commerce. Id.
In the case sub judice, plaintiffs have not proven and, on appeal, do not assert that Act 1316 imposes a discriminatory burden on interstate commerce. We recognize that Act 1316 has had a tremendous impact on the availability of saltwater finfish for markets both within the state of Louisiana and beyond the state's borders. Through restrictions on the use of gill nets in the harvesting of saltwater finfish, Act 1316 simply removes from the stream of commerce the quantity of saltwater finfish available as articles of commerce. Since we have concluded that Act 1316 does not discriminate between interstate and intrastate commerce, the controlling question is whether the incidental burden imposed on interstate commerce by the Louisiana legislation "is clearly excessive in relation to the putative local benefits." Minnesota, 449 U.S. at 472, 101 S.Ct. at 728.
*128 Saltwater finfish (and their byproducts) continue to move freely across the Louisiana state border even though, through Act 1316's modification in the legal methods of harvesting saltwater finfish, the available quantities may be less bountiful. This incidental burden on interstate commerce merely reflects the Louisiana Legislature's response to the depletion of saltwater finfish in the waters of Louisiana. Act 1316 does not burden out-of-state interests more heavily than saltwater finfish interests within the state of Louisiana. States have a substantial interest in environmental protection and resource conservation. Id., 449 U.S. at 471, 473, 101 S.Ct. at 727, 729. Based on this record, we find that the nondiscriminatory incidental burden on commerce produced by the restrictions of gill nets in the commercial harvesting of saltwater finfish imposed by Act 1316 is not clearly excessive in relation to the local benefits, i.e., preservation of the various species of saltwater finfish found in Louisiana's waters. Moreover, plaintiffs have not suggested any alternative statutory schemes which would more effectively accomplish the Legislature's goal of managing the State's stocks of saltwater finfish without a resulting nondiscriminatory incidental impact on commerce.
State regulation, based on police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity may constitutionally stand. Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 448, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). We find no error in the trial court's implicit rejection of plaintiffs' claim that Act 1316 substantially burdens interstate commerce in derogation of the Commerce Clause of the Constitution.

EQUAL PROTECTION/DUE PROCESS
Statutes are presumed to be constitutional, and the burden of proving that an act of the Legislature is unconstitutional is upon the party attacking the act. Soloco, Inc. v. Dupree, 97-1256, p.2 (La.1/21/98); 707 So.2d 12. The power of the Legislature is plenary, and a party challenging a statute's constitutionality must articulate a particular constitutional provision that limits the Legislature's powers. Id. In the case sub judice, plaintiffs have invoked the equal protection provision of the Louisiana Constitution and principles of substantive and procedural due process. We will address each of these arguments in turn.
Louisiana Constitution Article I, § 3 provides:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
Louisiana Constitution Article I, § 3 provides for three levels of constitutional review or scrutiny. Laws which classify individuals based on race or religious beliefs are repudiated completely. An intermediate level of scrutiny is reserved for laws which classify persons on the basis of birth, age, sex, culture, physical condition, or political ideas or affiliation. The lowest level of scrutiny applies to laws which classify persons on any basis other than those enumerated in La. Const. Art. I, § 3. Such laws need only be rationally related to a legitimate governmental purpose, and a person attacking the constitutionality of such a classification has the stringent burden of demonstrating that the law does not suitably further any appropriate state interest. Id.
Plaintiffs suggest that commercial fishermen constitute a culture and heritage, unique to Louisiana. Thus, they assert an intermediate level of scrutiny is appropriate under the facts of this case.
In reviewing the trial court's determination that § 305 B(14)(a) of Act 1316 was a violation of equal protection of the law under the Louisiana Constitution, the Louisiana Supreme Court explained:
The first step in the analysis of this issue is to define the appropriate level of constitutional scrutiny. Given the economic nature of the gear licensing regulation at issue, we conclude that the rational basis *129 standard applies. See Moore v. RLCC Technologies, Inc., 95-2621 (La.2/28/96); 668 So.2d 1135, 1143 (noting that the "rational basis standard traditionally [is] applied to legislation involving economics and social welfare" and police power); see also Lane v. Chiles, 698 So.2d 260 (Fla.1997) (because fishing is not a fundamental right and commercial fishermen do not constitute a suspect class, the rational basis test applies); LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370, 1382 (E.D.La.1978); City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding a ban on pushcart vendors in the French Quarter, along with a grandfather provision, under the rational basis standard).
Louisiana Seafood Management Council, 97-1367 at p.14; 715 So.2d at 395.
Thus, we apply the rational basis standard in addressing plaintiffs' equal protection challenge.
Under the rational basis standard, great deference is given to legislative determinations. A classification is constitutional if it has some reasonable basis. A classification "does not offend the constitution simply because [it] is not made with mathematical nicety or because in practice it results in some inequality." Id.
In their equal protection challenge, plaintiffs maintain that the real purpose of Act 1316 is a "class-based discrimination in favor of recreational fishermen."
The express purpose of Section 2 of Act 1316, as articulated in § 13.1, is "to promote the enhancement of Louisiana's marine resources by the removal of indiscriminate entanglement nets from coastal waters." It is well-settled that a state's police powers include safeguarding the wildlife and fisheries for the benefit of its people. La. Const. Art. IX, § 1; see State v. McHugh, 92-1852, p.9 (La.1/6/94); 630 So.2d 1259, 1264-65. Act 1316 was enacted pursuant to the state's police powers as a conservation measure. The expert evidence adduced at the trial on the permanent injunction, including those experts tendered by plaintiffs, established that Act 1316, which contains provisions restricting gear use, places where gill nets can be used and seasons, constitutes a conservation measure and moves the fisheries resources toward maximum protection of the various species.
Additionally, we note that La. R.S. 56:302.3 (as enacted pursuant to Act 1316) specifically prohibits use of gill nets, trammel nets, strike nets or seines by recreational fishermen. Thus, Act 1316 does not seek to single out particular kinds of fishermen; rather, the restrictions established by Act 1316 relate only to particular kinds of fishing equipment. See Lane v. Chiles, 698 So.2d 260, 264 (Fla. 1997).
Based on this record, we conclude that the statutory provisions enacted pursuant to Act 1316 are rationally related to the Legislature's express purpose of promoting the enhancement of the state's marine resources and do not amount to an equal protection violation under La. Const. Art. I, § 3.[10]
We turn now to plaintiffs' substantive due process challenges to the statutory provisions enacted pursuant to Act 1316. Plaintiffs urge the enactment of Act 1316 constitutes an unreasonable use of the Legislature's police powers and, as such, is arbitrary, capricious and in violation of substantive due process under Art. I, § 2 of the Louisiana Constitution. They further contend that through the enactment of Act 1316, they have been deprived of property rights, personal property (i.e., gear and capital investments) and a fundamental liberty *130 interest (i.e., the right to engage in a lawful occupation) without just compensation.
Louisiana Constitution Article I, § 2 provides, "No person shall be denied life, liberty, or property without due process of law." The substantive component of the federal Due Process Clause prohibits a governmental entity from enacting legislation which bears no relationship to the "public health, safety, morals, or general welfare," and thus is beyond the government's police power. See Standard Materials, Inc. v. City of Slidell, 96-0684, p.13 (La.App. 1st Cir. 9/23/97); 700 So.2d 975, 985. Article I, § 2 of the Louisiana Constitution has been recognized as the source of substantive due process protection under the Louisiana Constitution. Standard Materials, Inc., 96-0684 at p.13; 700 So.2d at 985.
Plaintiffs' substantive due process challenge in the case presently before us involves a claim that the statutory provisions enacted pursuant to Act 1316 amount to action by state government which interferes with their property and liberty interests in an arbitrary and capricious manner. Plaintiffs must first establish the existence of a constitutionally protected property or liberty interest. Id. at p.14; 700 So.2d at 986. In the direct appeal of those portions of Act 1316 which were declared unconstitutional by the trial court, the Louisiana Supreme Court determined, in the context of plaintiffs' takings clause challenge, that plaintiffs lacked any property interest in the fish they harvest. Louisiana Seafood Management Council, 97-1367 at p.8; 715 So.2d at 392. We are therefore duty-bound to hold that plaintiffs have failed to establish a protected property interest in the fish. Likewise, our Supreme Court's determinations that the restrictions of use of plaintiffs' gear and capital investments do not constitute a "taking," Louisiana Seafood Management Council, 97-1367 at pp. 8-9; 715 So.2d at 392-93, and that plaintiffs lack a property interest in the "right to fish," Louisiana Seafood Management Council, 97-1367 at pp. 9-13; 715 So.2d at 392-95, constrain this court to find that plaintiffs have failed to establish the "property interest" requirement of a substantive due process claim. Plaintiffs' contention that through the enactment of Act 1316 they have been deprived of the right to engage in a lawful occupation, however, is within the ambit of due process protection. See LaBauve v. Louisiana Wildlife & Fisheries Comm'n, 444 F.Supp. 1370, 1377-79 (La.E.D.1978).
Even if a party establishes the "liberty interest" requirement, a violation of substantive due process still requires arbitrary and capricious conduct by the governing authority. Legislation offends substantive due process if the government action is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. See Standard Materials, Inc., 96-0684 at pp. 14-15; 700 So.2d at 985. In other words, government action comports with substantive due process if the action is rationally related to a legitimate government interest. Id. As we concluded in our consideration of plaintiffs' equal protection challenge, the restrictions on the use of gill nets are rationally related to the Legislature's stated purpose of promoting the enhancement of the state's marine resources by the removal of indiscriminate entanglement nets from coastal waters. Accordingly, we hold that the statutory provisions enacted pursuant to Act 1316 are not in violation of plaintiffs' substantive due process rights under the Louisiana Constitution.[11]
Plaintiffs urge they were denied a reasonable opportunity to participate in the Commercial Fisherman's Economic Assistance Program in violation of their procedural due process rights.
*131 The fundamental requirement of procedural due process is notice and the opportunity to be heard at a meaningful time and in a meaningful manner. Hudson v. Dep't of Public Safety and Corrections, Louisiana State Penitentiary, 96-0499, p.5 (La. App. 1st Cir. 11/8/96); 682 So.2d 1314, 1318, writ denied, 96-2942 (La.1/3197); 687 So.2d 408.
Pursuant to the terms of § 13.1 as enacted in Act 1316, an applicant seeking eligibility in the Program was required to submit an application no later than October 1, 1995. The record establishes that by actual notice from the legislative process or through affiliations with various commercial fishing associations, none of the plaintiffs who testified were without notice of the displacement of their gill net use and the opportunity available to each to apply for participation in the Program. On December 15, 1995, DWF sent written notices to all those applicants who had mailed in their applications by October 1, 1995, as well as to all saltwater gill net fishermen duly licensed in 1995, advising that they appear in person at a workshop on December 27, 1995, for an explanation and to execute contracts to Purchase the nets. The letter delineated the financial information the applicant would have to present in order to qualify.
Based on this record, we conclude that plaintiffs have been given notice and the opportunity to be heard at a meaningful time and in a meaningful manner. Accordingly, we find that the Commercial Fisherman's Economic Assistance Program does not deny plaintiffs their procedural due process rights.[12]

CONCLUSION
For the reasons set forth herein, we affirm the trial court's judgment determining that the statutory provisions enacted pursuant to Act 1316 are constitutional and denying plaintiffs permanent injunctive relief.[13]
AFFIRMED.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Louisiana Acts 1995, No. 1316 amended and reenacted significant sections of Title 56 of the Revised Statutes.
[3] Plaintiffs assert that the trial court erred in limiting certification of this lawsuit as a class action to those plaintiffs "who were either licensed or permitted to fish commercially when Act 1316 went into effect," and urge that the class be broadened to include those involved in the fishery operations. This court has articulated that the standard of review for certification of class actions is two-fold. The factual findings are reviewed under the manifest error/clearly wrong standard; the trial court's discretionary judgment on whether to certify the class or not is reviewed by the abuse of discretion standard. Boudreaux v. State, 96-0137, p.5 (La.App. 1st Cir. 2/14/97); 690 So.2d 114, 119. In this case, the trial court apparently determined that the representatives of the fishery operations do not share a common character with those representatives of the commercial fishermen sufficient to warrant the broad certification plaintiffs requested. The common character element restricts class actions to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Id. at p.7; 690 So.2d at 120. We cannot say the trial court erred in its conclusion that those in the fishery operations are not similarly situated with those licensed/permitted commercial fishermen effected by the enactment of Act 1316. Accordingly, we find no abuse of the trial court's discretion in declining to certify the class to include those in the fishery operations.
[4] The trial court expressly reserved judgment on plaintiffs' allegations of violations under the Commerce Clause of the United States Constitution and the takings clause of the Louisiana Constitution until the trial on the permanent injunction.
[5] Although the trial court also concluded that §§ 305 B(4)(b) and 305.5 B were unconstitutional, the Legislature's 1997 repeal of La. R.S. 56:305 B(4)(b) and amendment of La. R.S. 56:305.5 B rendered moot the issue of whether those two sections of Act 1316 were in violation of the Commerce Clause of the United States Constitution. Louisiana Seafood Management Council v. Louisiana Wildlife and Fisheries Comm'n, 97-1367, p.2, n.6 (La.5/15/98); 715 So.2d 387, n. 6.
[6] See La. Const. Art. V, § 5(D).
[7] In this appeal, plaintiffs assigned as error the trial court's denial of lost income from their claim of entitlement to just compensation for the taking of their property. Because the Supreme Court has determined that Act 1316 did not result in the taking of any property right possessed by plaintiffs, the issue of plaintiffs' entitlement to additional compensation has been rendered moot. Accordingly, we do not address plaintiffs' contentions on this point.
[8] La. R.S. 56:638.3, entitled "Purposes," provides:

In order to implement the objectives and purposes of this Subpart [L], the commission shall:
(1) Take timely action to conserve and manage saltwater finfish species.
(2) Promote the use of sound conservation and management principles in the regulation of commercial and recreational fishing.
(3) Actively advocate, on behalf of the saltwater finfish constituency, improvement of or no net loss of the functionality and value of the saltwater fisheries' habitat and estuary.
(4) Provide for the preparation and implementation of fishery management plans, in accordance with this policy that will prevent overfishing and will achieve and maintain plentiful fish populations to ensure, on a continuing basis, the optimum yield from each fishery.
(5) Recognize that saltwater finfish populations are subject to both natural and man-induced increases and decreases, and that changes in harvest levels may need to be recommended. If changes are required, these increases and decreases should be distributed among all fishermen in a fair and equitable manner that considers among other factors historical usage, ensuring that no historical user groups will be arbitrarily excluded.
La. R.S. 56:638.5, entitled "Saltwater fishery standards," sets forth the following:
The commission shall adopt such rules and regulations, consistent with the authority granted by this Chapter, and in accordance with the Administrative Procedure Act, for the harvesting, conservation, and management of all species of saltwater finfish, in accordance with the following standards:
(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield while maintaining healthy, plentiful stocks. In fact, every effort will be made at all times to prevent a harvest from exceeding the safe upper limit of harvests which can be taken consistently year after year without diminishing the stocks so that the stock is truly inexhaustible and perpetually renewable.
(2) Conservation and management measures shall be based upon the best scientific, economic, biological, anthropological, and sociological information available.
(3) To the extent practicable, an individual stock or unit of fish shall be managed as a unit throughout its range within the state's jurisdictional authority and interrelated stocks of fish or other saltwater resources shall be managed in close coordination.
(4) If it becomes necessary to allocate or assign fishing privileges among various fishermen, such allocations to the extent practicable shall be:
(a) Fair and equitable to all such fishermen.
(b) Reasonably calculated to promote conservation.
(c) Carried out in such a manner that no particular individual, corporation, or other legal entity acquires an excessive share of such privileges.
(d) In the best interest of the citizens of Louisiana.
(5) Conservation and management measures shall, where practicable, promote efficiency in the conservation and management of fishery resources; except that no such measure shall have economic allocation as its sole purpose.
(6) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.
(7) Conservation and management measures may take into account and allow for variations among, and contingencies in, fisheries resources and catches.
[9] Plaintiffs urge the inequitable allocation of saltwater finfish resources between commercial and recreational fishermen violates the Public Trust Doctrine contained in Art. IX, § 1 of the Louisiana Constitution, as well as the standards set forth in La. R.S. 56:640.3, as enacted pursuant to Act 1316. The trial court rejected plaintiffs' Public Trust Doctrine claim at the close of plaintiffs' case-in-chief on the permanent injunction and granted defendants' oral motion for involuntary judgment. While plaintiffs offered evidence suggesting that recreational fishermen collectively caught a larger quantity of fish than commercial fishermen, that was countered by defendants' evidence (adduced at the hearing on the preliminary injunction and duly admitted into the record at the trial on the permanent injunction) indicating that examination of quantity of fish caught did not take into consideration the total poundage of fish harvested by commercial fishermen compared with that of recreational fishermen or the effect of underreporting of commercial fish harvests. Accordingly, we cannot say the trial court was erroneous in concluding that plaintiffs failed to meet their burden of proving inequitable allocation.
[10] Plaintiffs specifically maintain that the weekend ban on commercial fishing amounts to unequal protection under the law. The record establishes that the restriction of commercial fishing on weekends assists in the effective enforcement of DWF regulations and, therefore, is rationally related to the express purpose of Act 1316 which is to promote the enhancement of Louisiana's marine resources.

Additionally, plaintiffs assert the trial court erred in failing to hold unconstitutional on equal protection grounds the requirement within the provisions of Act 1316 of showing an applicant a previous gill net licensure as a condition of licensure for trammel net and/or seine fishing. In light of the evidence plaintiffs presented on this issue, we find the amendment to La. R.S. 56:305.5B renders the issue moot.
[11] Plaintiffs rely on City of Shreveport v. Curry, 357 So.2d 1078, 1081 (La.1978), to assert that Act 1316 is an unreasonable use of the state's police power under La. Const. Art. I, § 2. Legislation does not cut constitutional muster if there is no real and substantial relationship between the regulation and the protection or promotion of the general welfare. City of Shreveport, 357 So.2d at 1082. Based on the evidence in this record and mindful of the express purpose of promotion of the state's marine resources, we conclude that a real and substantial relationship exists between the statutory provisions enacted pursuant to Act 1316 and the promotion of the general welfare.
[12] Plaintiffs' contention that the denial in Act 1316 of a commercial rod and reel license to those convicted of any fishery-related violation which constitutes a class three or greater violation amounts to double and excessive punishment under La. Const. Art. I, §§ 2 and 20 has been rendered moot by the Legislature's repeal, by Acts 1197, No. 727, § 2, of La. R.S. 56:305B(14)(c).
[13] Plaintiffs assigned error to the trial court's determination that those portions of Act 1316 which it determined were unconstitutional were severable from the remainder of the act. Because our Supreme Court has reversed the trial court, and we have concluded the remainder of Act 1316 is constitutional, the issue of severablity is moot. Therefore, we do not address plaintiffs' contention relative to severability.