757 So.2d 1 (1999)
Albert J. AVENAL Jr., et al.
v.
The STATE of Louisiana and the Department of Natural Resources.
No. 99-C-0127.
Court of Appeal of Louisiana, Fourth Circuit.
March 3, 1999.
Opinion on Rehearing March 15, 2000.
Writ Denied June 23, 2000.
*2 Richard P. Ieyoub, Attorney General, Andrew C. Wilson, David L. Carrigee, Donna M. Young, Jedd S. Malish, Burke & Mayer, Special Assistants Attorney General, New Orleans, LA, Attorneys for Relator/Defendant, the State of Louisiana, through the Department of Natural Resources.
Wendell H. Gauthier, Scott Labarre, Gauthier & Murphy, Metairie, Louisiana and Michael St. Martin, Michelle Mayne Davis, St. Martin & Williams, Houma, LA, Carolyn A. McNabb, McNabb & Mire, Houma, LA, and Philip Cossich, Lawrence Dyess, Cossich & Sumich, Belle Chasse, LA, Attorneys for Respondents/Plaintiffs.
Wendell H. Gauthier, Scott LaBarre, Gauthier, Downing, LaBarre, Beiser & Dean, Metairie, Louisiana and Michael St. Martin, Joseph Jevic, St. Martin & Williams, Houma, LA, Carolyn A. McNabb, McNabb & Mire, Houma, LA, and Philip Cossich, Les Martin, Cossich, Sumich & Parisiola, Belle Chasse, LA, Attorneys for Respondents/Plaintiffs on rehearing.
Court composed of Chief Judge ROBERT J. KLEES, Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY III, Judge Pro Tempore PHILIP C. CIACCIO and Judge Pro Tempore JAMES C. GULOTTA.
WALTZER, Judge.
The state, defendant, seeks review of the denial of summary judgment. The state argues that a federal judgment, dismissing all claims by these same plaintiffs against the United States' government, precludes re-litigation of the same issues against the state in this second action.

FACTS AND PROCEDURAL HISTORY
Plaintiffs, oyster leaseholders/fishermen, filed the present class action on 29 March 1994 on behalf of all persons holding oyster leases on state water bottoms in Breton Sound. Plaintiffs alleged that a taking had occurred without just compensation in violation of the Fifth Amendment to the U.S. Constitution and Article 1, § 4 of the Louisiana Constitution because their oyster leases were adversely affected by the freshwater outflow from the Caernarvon freshwater diversion structure, located on the east bank of the Mississippi River in Plaquemines Parish.
On 26 April 1994, Avenal and virtually all of the same representative plaintiffs in the present state suit, with some new ones, filed suit in the U.S. Court of Federal Claims against the United States and its agencies, including but not limited to the U.S. Army Corps of Engineers, which designed, *3 financed and built the Caernarvon freshwater diversion structure. In that suit, the plaintiffs alleged a taking under the Fifth Amendment to the U.S. Constitution, one of the two claims raised in the present suit, and sought a class certification.
Defendant in the federal suit moved for summary judgment on several grounds. The Court of Claims granted summary judgment in August 1995.[1] On appeal to the Court of Appeals for the Fifth Circuit, that decision was affirmed in November 1996.[2]
Following the Avenal Fifth Circuit decision, defendant in the present state suit filed a motion for summary judgment arguing that collateral estoppel barred the re-litigation of the issues decided by federal judgment. The trial court denied the motion for summary judgment on 5 January 1998, "for the reasons set forth at the hearing" held that same date. (No transcript of the hearing is attached to defendant's writ application.)
Both the Court of Claims and the Fifth Circuit decisions are rich in facts. The undisputed facts, as taken from those decisions, show that federal and state government action was being planned as far back as the 1950's and 1960's to divert freshwater from the Mississippi River into adjacent marsh lands to improve oyster habitats and to reduce the mortality rate associated with increased salinity levels. According to a 1959 memorandum by the U.S. Fish and Wildlife Service to the U.S. Army Corps of Engineers, this action would benefit existing oyster-rich marshlands which had, over time, become too saline as a result of man-made and natural causes. Based on that memorandum, in 1965 Congress authorized certain freshwater diversion structures to be built in and around the Breton Sound Basin, which lies east of the Mississippi River and south of New Orleans. In 1968, the Corps proposed Caernarvon as a situs for a freshwater diversion control structure.
During the 1970's, the zone favorable for oyster growth continued to move landward, due to salinity changes, spawning an oyster community in marshlands which had previously been too fresh to sustain such growth. However, this inland movement of salinity had the deleterious effect of rendering unusable large areas of previously productive oyster grounds. The evidence showed that the representative plaintiffs in the federal suit, with few exceptions, the same representative plaintiffs in the present state action, had acquired their leases for oyster farming at the earliest, in 1976. These leases covered those areas which had previously been unsuitable for oyster growth.
Between 1978 and 1982 the Corps and relevant state and local agencies continued to discuss at informal meetings the construction of a freshwater diversion structure at Caernarvon. The Corps issued a final report in September 1984, proposing that one large freshwater diversion structure be constructed at Caernarvon. In October 1986, Congress authorized funds for the construction of the Caernarvon project.
Although the State of Louisiana expressed its intent to participate in the Caernarvon project as early as January 1982, the State did not enter into a formal agreement with the Corps until June 1987. The agreement provided that the State was to be responsible for 25 percent of the total costs of construction, and would maintain and operate the facilities following construction. Construction of the Caernarvon freshwater diversion project commenced in June 1988 and was completed in February 1991. The Caernarvon project was modeled after smaller state and local diversion structures constructed in the 1950's and 1960's, which had proved effective in restoring oyster production *4 previously destroyed by excessive salinity levels.
Plaintiffs in both the federal suit and the present suit claim that the freshwater diverted from the Mississippi River by the Caernarvon project dilutes the salinity of the waters where their oyster leases are located, increases the growth of vegetation and bacteria on or near the water bottoms there, and causes silt to deposit there, rendering plaintiffs' leases incapable of oyster growth and cultivation.
In their motion for summary judgment filed in federal court, the United States alleged several grounds, including that the plaintiffs had no compensable expectancy in continued saltwater intrusion or a particular salinity level, and that the plaintiffs had no reasonable investment-backed expectations to continuation of the saltwater intrusion or a particular salinity level which was caused by earlier diversion of freshwater from its historic flows.
The Court of Claims ruled that the plaintiffs lacked a compensable property interest in the salinity of the water for purposes of the Fifth Amendment's taking clause and dismissed the suit. The Fifth Circuit affirmed that judgment on other grounds. The federal appellate court found that the plaintiffs did have a property interest, created by the state, which was protected by the Fifth Amendment, and that the federal and state project had altered the salinity conditions to the detriment of oyster cultivation. However, the court found that no compensable taking occurred since the plaintiffs had taken advantage of favorable conditions created by prior projects, and knew or should have known of the expected freshwater diversion that would adversely affect their oyster leases, and thus could not have had a legitimate investment-backed expectation that conditions would remain favorable for oyster cultivation.

SUPERVISORY JURISDICTION
Clearly, the denial of a motion for summary judgment is an interlocutory judgment from which the parties do not have the right to appeal. LSA-C.C.P. art. 1841. However, our exercise of supervisory jurisdiction is purely discretionary. LSC.C.P. art. 2201.
In Scott v. Pontchartrain Materials Corp., 98-1611, p. 3 (La.App. 4 Cir. 8/12/98), 717 So.2d 682, 684, this court stated:
Appellate courts must review summary judgments de novo. Act No. 483 of 1997 amended LSA-C.C.P. art. 966 effective August 15, 1997, and it is to be applied retroactively as well as prospectively. Perry Waller v. American Seafoods Co., 97-0302, p. 1 (La.App. 4 Cir. 10/1/97), 700 So.2d 1306, 1307, writ not considered, 97-2769 (La.1/30/98), 709 So.2d 693.
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966 A(2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966 B. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden does not require him to negate all essential elements of the adverse party's claim, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim. LSA-C.C.P. art. 966 C(2).
Id.
"Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there *5 is no genuine issue of material fact." LSA-C.C.P. art. 966 C(2).
Plaintiffs initially attack defendant's need for supervisory review, citing the lack of any showing of irreparable harm. LSA-C.C.P. art. 2083(A). However, because summary judgment is now favored, this court reviews denials of motions for summary judgments in all but the most exceptional cases. This case does not present exceptional circumstances.

COLLATERAL ESTOPPEL
We must first consider the applicable law. Relators argue for application of federal law to determine the effect of this judgment rendered by a federal court. However, respondents argue for application of state law to this suit in state court.
We must apply federal law to determine the effect of the judgment, rendered in the federal action, on the proceedings in state court. Reeder v. Succession of Palmer, 623 So.2d 1268, 1271 (La.1993). We must apply federal law to "determine the preclusive effects of a judgment rendered by a federal court exercising federal question jurisdiction." Id. In the federal action, the fishermen sued under the United States' Constitution, and the federal court exercised its federal question jurisdiction. In Reeder, the Louisiana Supreme Court decided to apply federal law to determine the preclusive effect of a judgment from which the defendants asserted the defense of res judicata (or claim preclusion). Although we are asked to determine the preclusive effect, based on collateral estoppel (or issue preclusion) of a judgment, we are required to apply federal law.
Applying federal law to determine what effect the federal judgment has to this action, we consider the doctrine of collateral estoppel. Collateral estoppel requires the existence of three facts: (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a necessary part of the judgment in that earlier action. RecoverEdge, L.P. v. Pentecost, 44 F.3d 1284, 1291 (5th Cir. 1995). Some cases recognize a fourth requirement for application of issue preclusion, that no special circumstances exist rendering preclusion inappropriate or unfair. Id., at Fn. 12. Collateral estoppel, unlike res judicata, does not require mutuality between the parties to the prior action and the parties in the subsequent action in which the defendants raise the issue of collateral estoppel. Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788.
Respondents argue that no identity of issues exists in the two separate actions, that the parties did not actually litigate the issue, and that fairness precludes application of collateral estoppel. An identity of issues exists when the facts and the legal standard used to assess the facts are the same in both proceedings. Copeland v. Merrill Lynch & Co., Inc., 47 F.3d 1415, 1422 (5th Cir.1995). In the federal action, a class of oyster fishermen sued, under the United States Constitution, the federal government for compensation for a taking. Basically, the lessees alleged that the Caernarvon freshwater diversion project, constructed by both the federal and state governments, damaged their property, decreased the economic potential of their leases. They argued that this project caused conditions unfavorable to oyster growth, decreasing the value of their leases. These same fishermen/lessees sued the State of Louisiana for these same damages in this state proceeding under both the United States and the Louisiana Constitutions. We are presented in this action with the same plaintiffs seeking the same remedy for the same harm from a different defendant. Therefore, the facts in the federal action and the facts in this proceeding are exactly the same.
Essentially, we must determine whether the legal standard applied to the same facts in the federal action is the same legal *6 standard applicable in this action. The United States and Louisiana Constitutions prevent takings by government entities without compensation. The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." The Louisiana Constitution likewise provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.
LSA-Const. Art. 1, § 4.
The federal constitutional provision protects against takings by both federal and state governments. However, the Louisiana Constitution does not protect against takings by the federal government. The Louisiana Constitution guarantees fewer protections against public takings than the United States Constitution. State Through Department of Transportation and Development v. Chambers Inv. Co., 595 So.2d 598, 604 (La.1992). Louisiana courts have consistently considered federal law in analyzing whether particular facts constitute a taking of property in similar inverse condemnation suits. Louisiana Seafood Management v. Louisiana Wildlife and Fisheries Commission, 97-1367 (La.5/19/98); 715 So.2d 387, 392-93; Ursin v. New Orleans Aviation Board, 506 So.2d 947, 955 (La.App. 5 Cir. 4/15/87), reversed for different reasons by 515 So.2d 1087 (La.1987); Annison v. Hoover, 517 So.2d 420, 423 (La.App. 1 Cir. 12/22/87); writ denied by (La.2/12/88), 519 So.2d 148; Layne v. City of Mandeville, 633 So.2d 608, 610 (La.App. 1 Cir. 12/29/93), writ denied by 94-0268 (La.3/25/94); 635 So.2d 234; Standard Materials, Inc. v. City of Slidell, 96-0684 (La.App. 1 Cir. 9/23/97); 700 So.2d 975, 984. Clearly, a distinction exists between claims for inverse condemnation and claims for expropriation. Louisiana courts have explicitly recognized this distinction.[3]State, Through Department of Transportation and Development v. Chambers Inv. Co., supra at 602. Moreover, in determining whether a state law so limited the use of certain property to constitute a constitutional taking, the Louisiana Supreme Court recently addressed whether fishermen owning gill nets "have a justifiable investment backed reliance interest." Louisiana Seafood Management v. Louisiana Wildlife and Fisheries Commission, 97-1367 (La.5/19/98); 715 So.2d 387, 393. [Emphasis added.] That Court cited federal authority in its analysis of whether the gill net owners/fishermen suffered a taking because the new law "diminished the economic value of their equipment." Id., at 392.
In the lessees' federal action, the court of appeals reasoned:
When government limits the use a property owner may make of her property, without itself occupying or using the property for government purposes, the classic analytical tool for assessing whether a taking has occurred is the three-part test enunciated by the Supreme Court in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978): the court considers the character of the governmental action, the economic impact on the claimant and, particularly, the extent to which the governmental action has interfered with distinct investment-backed expectations. Id., at 124, 98 S.Ct., at 2659. Though it is a truism that "no set formula exists to determine whether compensation is constitutionally *7 required for a government restriction of property." Hendler v. United States, 952 F.2d 1364, 1373 (Fed. Cir.1991), see Penn Central, 438 U.S., at 124, 98 S.Ct., at 2659, 57 L.Ed.2d 631, the Penn Central formulation provides guidance in analyzing what the trial court here viewed as a question of first impression.
The case before us presents a textbook example of a situation in which the plaintiffs, in the face of established public concerns and while governmental efforts to address those concerns were well known, moved to take advantage of the existing conditions for their own economic benefit. There is nothing wrong with their having done that; the State of Louisiana provided the mechanism for it, and their own initiative gave them whatever economic advantages the situation afforded. It is hard for them to claim surprise, however, that the preexisting salinity conditions, created at least in part by earlier government activity, were not left alone, but were again tampered with to their (this time) disadvantage.
Avenal v. United States, 95-5149 (Fed. Cir.11/12/96); 100 F.3d 933, 937. Furthermore, the federal appeals court held, "these plaintiffs, in the words of Penn Central, cannot have had reasonable investment-backed expectations that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal governments." Id. [Emphasis added.] Our review of the record and the applicable law persuades us that the issue decided in the federal action and the issue confronting the state court in this proceeding are identical. Therefore, we conclude that an identity of issues exists.
Respondents also argue that collateral estoppel does not apply to preclude relitigation of their claims because the issue of whether they had reasonable investment-backed expectations, constituting a taking, was not actually litigated. Collateral estoppel is unavailable when a "new determination of the issue is warranted by differences in the quality or extensiveness of the procedure followed in the two courts." Copeland, supra at 1423. [Emphasis added.] Respondents do not argue that the procedures employed by the federal court, as opposed to those procedures employed by the state court, differ. They do not even argue that the issue decided from the record on appeal was not "actually litigated." They argue only that we should disregard the federal judgment because the trial court based its conclusion on one reason, and the appeals court decided the case on another issue. We believe that the parties actually litigated whether plaintiffs' "property interest was taken." Avenal, supra at 936.
Respondents argue that we should not apply the doctrine of collateral estoppel since special circumstances exist. We must consider "whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate." Blonder-Tongue Laboratories, Inc., supra at 329, 91 S.Ct., at 1443. The special circumstances upon which the respondents rely involve alleged errors in factual conclusions by the federal court of appeals because, as they contend, the record on appeal was incomplete. They do not allege that the federal proceedings denied them an "opportunity to litigate." Moreover, plaintiffs do not argue that the alleged circumstances resulted from the conduct of others. Jenkins v. State, 615 So.2d 405, 407 (La.App. 4 Cir.1993), writ denied by 617 So.2d 932. We do not believe that special circumstances exist.

CONCLUSION
Applying federal law to determine whether the doctrine of collateral estoppel precludes re-litigation of plaintiffs' claims for compensation for the diminution of the value of their oyster bed leases, we conclude that an issue necessary to their claims for relief in the state action was previously litigated and decided in the federal action. Accordingly, for the reasons *8 discussed, we reverse the judgment of the trial court and dismiss the plaintiffs' claims under both the United States and Louisiana Constitutions, since the federal judgment precludes re-litigation of an issue which a federal court has already decided.
WRIT GRANTED, JUDGMENT REVERSED.
KLEES, C.J., concurs and dissents for the reasons assigned by Judge McKAY.
McKAY, J., concurs in part and dissents in part.
McKAY, J., concurring in part and dissenting in part.
I agree with the majority opinion as it applies to plaintiffs' federal claims. However, I must respectfully dissent with the majority's finding that plaintiffs' state law claims are also precluded.
Louisiana law, which clearly pertains to the state laws claims in this case, does not recognize the doctrine of collateral estoppel. Steptoe v. Lallie Kemp Hospital, 634 So.2d 331, 335 (La.1994); Welch v. Crown Zellerbach Corp., 359 So.2d 154, 156 (La. 1978). In Welch, the Supreme Court rejected all forms of the doctrine, stating:
Collateral estoppel is a doctrine of issue preclusion alien to Louisiana Law. Developed in the common law, the device precluded the re-litigation of issues actually decide in a prior suit between the parties on a different cause of action.
Id. at 156. Since there has been no prior suit between the leaseholders and the Department of Natural Resources, collateral estoppel, even if it existed in Louisiana is inapplicable by its own terms.
Although, the legal standard required to establish a taking under the United States Constitution is no different in state court than it is in federal court, the legal standard of what constitutes a taking is different under the Louisiana Constitution. LSA-Const. Art. 1, § 4 provides in pertinent part:
Property shall not be taken or damaged by the State or its political subdivisions except for public purposes and with just compensation paid to owner or into court for his benefit.
There is a jurisprudentially recognized action for inverse condemnation, which arises out of "the self-executing nature of the constitutional command to pay just compensation." State, Through DOTD v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La.1992). The action for inverse condemnation is available in all cases where there has been a taking or damaging of property but just compensation has not been paid...Id.
In the instant case, plaintiffs' oyster leases are a recognized property under the laws of this state. Defendants' fresh water diversion project has allegedly caused damage to this right. Further, plaintiff claims defendant has not justly compensated the plaintiffs' for their loss. Because the defendants have not paid any compensation to plaintiffs, this case may amount to inverse condemnation.
Louisiana employs a three-pronged analysis to determine whether a claimant is entitled to eminent domain compensation. Chambers, 595 So.2d at 603.
Under this analysis, we must first determine if a person's legal right with respect to a thing or object has been affected. In other words, we must be able to identify a recognized species of property right that has been affected, regardless of whether causes of action may exist on the theories; otherwise, it cannot be said there has been an exercise of the power of eminent domain. Second, if it is determined that property is involved, we must decide whether the property, either a right or a thing, has been taken or damaged, in a constitutional sense. If property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question then is whether the taking or damaging *9 is for a public purpose under LSA-Const. Art. 1, § 4.
595 So.2d at 603.
A lessee's business losses, if proved to have been caused by the State's taking or damaging of property, are compensable under the "full extent of his loss" measure of recovery. State Through Dept. of Highways v. Constant, 369 So.2d 699 (La.1979). The lease of state-own water bottoms for, among other purposes, oyster cultivation, is provided for by law. See La. R.S. 41:1255 and R.S. 56:421 et seq. The plaintiff-oyster lessees have a protected property interest in their leases as found by the United States Fifth Circuit Court of Appeal. It is not disputed that this property right has been adversely affected by state action.
Accordingly, I agree with the trial court and would not grant the summary judgment in so far as it applies to any claims which plaintiffs may have under state law.
Court composed of Chief Judge ROBERT J. KLEES, Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY, III, Judge PHILIP C. CIACCIO, Judge JAMES C. GULOTTA.

ON APPLICATION FOR REHEARING
McKAY, Judge.
In this class action, the defendant seeks review of the trial court's refusal to grant summary judgment. On rehearing, we deny the writ and affirm the judgment of the trial court.

FACTS AND PROCEDURAL HISTORY
The impetus for the present litigation was the construction of the freshwater diversion structure located on the east bank of the Mississippi River at Caenarvon in Plaquemines Parish. As far back as the 1950's and 1960's, the federal and state governments were working on plans to divert freshwater from the Mississippi River into adjacent marshlands in order to improve oyster habitats and to reduce the mortality rate associated with increased salinity levels. The increased salinity levels were due to both man-made and natural causes. In 1965, Congress authorized the building of certain freshwater diversion structures in and around the Breton Sound Basin. In 1968, the U.S. Army Corps of Engineers first proposed Caernarvon as a sight for a freshwater diversion control structure.
Due to changes in the level of salinity, the zone favorable for oyster growth continued to move toward land during the 1970's. This change in salinity had the effect of rendering unusable large areas of previously productive oyster grounds. Between 1978 and 1982, the Corps held informal discussions with state and local agencies concerning the construction of a freshwater diversion structure located at Caernarvon. In September of 1984, the Corps issued a report that proposed that one large freshwater diversion structure be constructed at Caernarvon. Congress authorized funds for the construction of the Caernarvon project in October of 1986.
Although the State of Louisiana expressed its intent to participate in the project as early as 1982, the state did not enter into a formal agreement with the Corps until June of 1987. The agreement provided that the State was to be responsible for twenty-five percent (25%) of the total costs of construction, and would maintain and operate the facilities following construction. Construction on the project commenced in June of 1988 and was completed in February of 1991. The Caernarvon project was modeled after smaller state and local diversion structures constructed in the 1950's and 1960's, which had proved effective in restoring oyster production previously destroyed by excessive salinity levels. However, the plaintiffs in the present suit allege that the freshwater diverted from the Mississippi River by the Caernarvon project dilutes the salinity of the water where their oyster leases are located, thereby increasing the growth of vegetation and bacteria on or near the water bottoms and causing silt to *10 deposit there, thereby rendering plaintiffs' leases incapable of oyster growth and cultivation.
On March 29, 1994, the plaintiffs, certain oyster leaseholders/fishermen, filed the present class action on behalf of all persons holding oyster leases on state water bottoms in Breton Sound. The plaintiffs alleged that a taking without just compensation had occurred. The plaintiffs further alleged that this taking violated the Fifth Amendment of the United States Constitution and Article 1, § 4 of the Louisiana Constitution because their oyster leases were adversely affected by the freshwater outflow from the Caernarvon freshwater diversion structure.
On April 26, 1994, virtually all of the representative plaintiffs in the present suit as well as some additional plaintiffs filed suit in the United States Court of Federal Claims against the U.S. Army Corps of Engineers, which designed, financed, and built the Caernarvon freshwater diversion structure. In that suit, the plaintiffs alleged a taking under the Fifth Amendment to the United States Constitution and sought class certification.
The defendants in the federal suit moved for summary judgment which the Court of Claims granted in August of 1995.[1] The decision was affirmed by the Federal Circuit Court of Appeals in November of 1996.[2] Following the decision of the Court of Appeals, the defendants in the present state court action filed a motion for summary judgment, arguing that collateral estoppel bars the re-litigation of issues already decided by the federal courts. The trial court denied the motion on January 5, 1998. The defendants sought review of that ruling from this Court. On March 3, 1999, the majority of a five-judge panel granted the defendant's writ and reversed the trial court's denial of summary judgment. The plaintiffs applied for rehearing which was granted by the same five-judge panel on March 26, 1999. In connection with the rehearing, this Court ordered that the entire record be forwarded to this Court and allowed additional briefing and set oral argument before this Court.

STANDARD OF REVIEW
In this case we must determine whether the trial court's denial of the defendant's motion for summary judgment was proper. Appellate courts must review summary judgments de novo. Act No. 483 of 1987 amended La. C.C.P. art. 966 effective August 15, 1997, and it is to be applied retroactively as well as prospectively. Perry Waller v. American Seafoods Co., 97-0302, p. 1 (La.App. 4 Cir. 10/1/97), 700 So.2d 1306, 1307, writ not considered, 97-2769 (La.1/30/98), 709 So.2d 693. In the aforementioned case, the Court went on to explain:
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions such as this. The procedure is favored and shall be construed to accomplish these ends. La.C.C.P. art. 966 A(2). A summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the mover is entitled to judgment as a matter of law. La.C.C.P. art. 966 B. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden does not require him to negate all essential elements of the adverse party's claim, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim. La.C.C.P. 966 C(2).
Id.

DISCUSSION
The question central to our analysis of this case is whether the standard for a *11 taking is the same under Louisiana law as it is under federal law and if so whether the plaintiffs' action is barred by collateral estoppel. If the standard is the same or if the definition of a taking is broader under federal law, summary judgment should have been granted in the instant case. However, if the standard is different and the definition of a taking is broader under Louisiana law, the trial court's refusal to grant summary judgment was proper.
Louisiana law, which clearly pertains to the state law claims in this case, does not recognize the doctrine of collateral estoppel. Steptoe v. Lallie Kemp Hospital, 634 So.2d 331, 335 (La.1994); Welch v. Crown Zellerbach Corp., 359 So.2d 154, 156 (La.1978). In Welch, the Supreme Court rejected all forms of the doctrine, stating: Collateral estoppel is a doctrine of issue preclusion alien to Louisiana law. Developed in the common law, the device precluded the relitigation of issues actually decided in a prior suit between the parties on a different cause of action. Id. at 156. Since there has been no prior suit between the leaseholders and the Department of Natural Resources, even if collateral estoppel existed in Louisiana law, it is inapplicable by its own terms.
Although the legal standard required to establish a taking under the United States Constitution is no different in state court than it is in federal court, the legal standard of what constitutes a taking under the Louisiana Constitution is different. Article 1, § 4 of the Louisiana Constitution in pertinent part provides: "Property shall not be taken or damaged by the State or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit."
There is a jurisprudentially recognized action for inverse condemnation arising out of "the self-execution nature of the constitutional command to pay just compensation." State Through DOTD v. Chambers Investment Company, Inc., 595 So.2d 598, 602 (La.1992). The action for inverse condemnation is available in all cases where there has been a taking or damaging of property but just compensation has not been paid... Id.
In the instant case, the plaintiffs' oyster leases are a recognized property right under the laws of this state. The defendant's freshwater diversion project has allegedly caused damage to this right. The plaintiffs further claim that the defendant has not justly compensated them for their loss. Because the defendants have not paid any compensation to the plaintiffs, this case may amount to inverse condemnation.
Louisiana employs a three-pronged analysis to determine whether a claimant is entitled to eminent domain compensation. Id. at 603.
Under this analysis, we must first determine if a person's legal right with respect to a thing or object has been affected. In other words, we must be able to identify a recognized species of property right that has been affected, regardless of whether causes of action may exist on the theories; otherwise, it cannot be said there has been an exercise of the power of eminent domain. Second, if it is determined that property is involved, we must decide whether the property, either a right or a thing, has been taken or damaged, in a constitutional sense. If property is taken or damaged, one may say that there has been an attempted exercise of the eminent domain power. The final question then is whether the taking or damaging is for a public purpose under La. Const. Article 1 § 4.
Id. at 603.
A lessee's business losses, if proven to have been caused by the State's taking or damaging of property, are compensable under the "full extent of his loss" measure of recovery. State Through Dept. of Highways v. Constant, 369 So.2d 699 (La.1979). The lease of state-owned water bottoms *12 for, among other purposes, oyster cultivation, is provided for by law. See La. R.S. 41:1225 and La. R.S. 56:421 et seq. The federal Court of Appeals has already found that the plaintiffs/oyster lessees have a protected property interest in their leases. It is not disputed that this property right has been adversely affected by state action. It is also clear that the creation of the Caenarvon freshwater diversion structure was for a public purpose.
Because this is the case, our analysis must now turn to the question of whether different standards should be applied in cases where inverse condemnation rather than formal expropriation of property has taken place. There is no basis in Louisiana law for the different treatment of property owners in these two situations. The same substantive constitutional right (the right, secured by Art. I, § 4 of the 1974 Louisiana Constitution, to receive full compensation for the governmental taking of private property) is triggered by both. The only bar (complete or partial) to compensation in either of these situations is bad faith. State, Through Dept. of Highways v. Vermilion Development Co., 249 So.2d 167, 258 La. 1159 (La.1971); Parish of East Baton Rouge v. Landrum, 289 So.2d 215 (La.App. 1 Cir.1973); Holland v. State, Dept. of Transp., 554 So.2d 727 (La. App. 2 Cir.1989); State, Dept. of Transp. and Development v. Morein, 628 So.2d 1191 (La.App. 3 Cir.1993); Packard's Western Store v. State, Dept. of Transp. and Development, 618 So.2d 1166 (La.App. 2 Cir.1993). The "distinct investmentbacked expectations" of Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), is irrelevant to the question of whether a taking has occurred under Louisiana law. There is nothing in the record of the instant case to indicate that the plaintiffs were in bad faith.

CONCLUSION
For the foregoing reasons we find that the trial court was correct in denying the defendant's motion for summary judgment. Accordingly, this writ is denied and the judgment of the trial court is affirmed. This case is remanded to the district court for further proceedings.
WRIT DENIED, JUDGMENT AFFIRMED.
CIACCIO, J., concurs with additional reasons.
WALTZER, J., dissents.
CIACCIO, J., concurring.
I voted to grant a rehearing because my review of our earlier opinion disclosed errors of law that had lead to an erroneous judgment.
State, Through Department of Transportation and Development v. Chambers Inv. Co., 595 So.2d 598, 604 (La.1992), was an inverse condemnation proceeding. It held that the action for inverse condemnation is a procedural remedy for an owner to seek compensation for an uncompensated taking or damaging against a governmental entity where no expropriation has commenced. Further, the action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. The Court made no distinction regarding the scope of compensation or the burden of proof applicable to claims arising out of inverse condemnation or formal expropriation. Accordingly, our earlier opinion erred in finding a distinction between the two causes of action insofar as it would diminish the compensation payable to an inverse condemnation claimant.
Since the cause of action for an inverse condemnation claim arises out of the same self-executory nature of the constitutional demand to pay just compensation, State, Through Department of Transportation and Development v. Chambers Inv. Co., supra at 598, the same rules of law and evidence apply to both types of proceedings.
*13 In the case of State, Department of Transportation and Development v. Vermillion Development Co., 249 So.2d 167, 258 La. 1159 (La.1971), our Supreme Court enunciated the principle that knowledge of an anticipated expropriation does not bar a claim for compensation by a lessee of the property in the absence of proof of bad faith, fraudulent or predatory conduct. This rule of law has been uniformly followed in the cases cited in the majority opinion together with the case of Board of Commissioners v. Missouri Pacific Railroad, 625 So.2d 1070, 1076-78, (La.App. 4 Cir.1993), writs denied, 630 So.2d 802-3 (La.1994).
The crux of the dismissal of plaintiff's suit in the Federal Court was the finding that plaintiffs knowledge of the pending action of the Corps of Engineers and the State of Louisiana prevented them from having a "reasonable investment backed expectation that their oyster leases would give them rights protected from the planned freshwater diversion projects of the state and federal government." But prior knowledge of an anticipated expropriation is not a bar to compensation under Louisiana law. Aside from the procedural difficulty of applying collateral estoppel, the rule of law relied upon by the Federal court is contrary to the more liberal rule of law followed by our state courts.
No Louisiana case has denied compensation under the theory of the lack of a "justifiable investment backed reliance interest." In the case of Louisiana Seafood Management v. Louisiana Wildlife and Fisheries Commission, 97-1367 (La.5/19/98); 715 So.2d 387, 393, the plaintiffs commercial fishermen claimed to have a justifiable investment backed reliance interest in their right to fish. The Court did not decide the case on this basis but held that the plaintiffs did not possess a vested incorporeal right to fish so that there was no taking of any property right-corporeal or incorporeal-possessed by plaintiffs. Knowledge of an impending expropriation or regulatory action was not an issue.
Accordingly, I find no rule of law that requires us to use the Federal court decision to dismiss plaintiffs' suit on the basis of collateral estoppel. Plaintiffs bad faith, if alleged, is a matter of proof that is clearly in dispute at this stage of the proceedings at the trial level. Accordingly, the granting of summary judgment was not appropriate.
The trial judge was correct in denying the motion for summary judgment.
WALTZER, J., dissenting.
On rehearing, the majority concluded that "Since there has been no prior suit between the leaseholders and the Department of Natural Resources, even if collateral estoppel existed in Louisiana law, it is inapplicable by its own terms." They reasoned that "Although the legal standard required to establish a taking under the United States Constitution is no different in state court than it is in federal court, the legal standard of what constitutes a taking under the Louisiana Constitution is different." Moreover, the majority opined that "The `distinct investment-backed expectations' of Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), is irrelevant to the question of whether a taking has occurred under Louisiana law." From this opinion, I must dissent.
Concurring in the majority opinion, Judge Ciaccio posits that plaintiffs' "prior knowledge of an anticipated expropriation is not a bar to compensation under Louisiana law." Relying on State, Through Department of Highways v. Vermilion Development Co., 258 La. 1159, 249 So.2d 167, and Board of Commissioners v. Missouri Pacific Railroad Co., 625 So.2d 1070, the concurring opinion concludes that "the rule of law relied upon by the Federal court is contrary to the more liberal rule of law followed by our state courts." This opinion determined that the majority opinion on original hearing erred by "finding a distinction between the *14 two causes of action [inverse condemnation and expropriation] insofar as it would diminish the compensation payable to an inverse condemnation claimant."
In deciding the preclusive effect of a federal judgment, we are bound by Louisiana law (and arguably the United States Constitution) to apply federal law. Reeder v. Succession of Palmer, 623 So.2d 1268, 1271 (La.1993). Collateral estoppel, or issue preclusion, is a concept firmly entrenched in federal law. RecoverEdge, L.P. v. Pentecost, 44 F.3d 1284, 1291 (5th Cir.1995). Although the leaseholders did not sue the State of Louisiana in the prior federal suit, such an identity of parties is not required to apply the doctrine of collateral estoppel, issue preclusion. Blonder-Tongue Laboratories, Inc., v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1970).
We granted rehearing in this matter to consider whether the issue actually litigated in the prior federal action is identical to an issue at stake in this subsequent state action. In the federal action, the court found that no compensable taking occurred, since the plaintiffs had taken advantage of favorable conditions created by prior projects, knew or should have known of the expected freshwater diversion project and its potential to adversely affect their oyster leases, and could not have had a legitimate investment-backed expectation that conditions would remain favorable for oyster cultivation. Essentially, the federal court found that no constitutional taking had occurred, because the leaseholders did not have a legitimate investment-backed expectation. In determining what is a taking under the Louisiana Constitution, are the factors enunciated in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), relevant? I can find no authority for a conclusion that these factors are irrelevant. Moreover, numerous Louisiana cases have relied on federal authority for analyzing what is a constitutional "taking." Louisiana Seafood Management v. Louisiana Wildlife and Fisheries Commission, 97-1367 (La.5/19/98); 715 So.2d 387, 392-93, Ursin v. New Orleans Aviation Board, 506 So.2d 947, 955 (La.App. 5 Cir. 4/15/87), reversed for different reasons 515 So.2d 1087 (La.1987), Annison v. Hoover, 517 So.2d 420, 423 (La.App. 1 Cir. 12/22/87); writ denied by 519 So.2d 148 (La.2/12/88), Layne v. City of Mandeville, 93-0046 (La.App. 1 Cir. 12/29/93); 633 So.2d 608, 610, writ denied by 94-0268 (La.3/25/94); 635 So.2d 234, Standard Materials, Inc. v. City of Slidell, 96-0684 (La. App. 1 Cir. 9/23/97); 700 So.2d 975, 984.
Both the majority and the concurring opinions concluded that Louisiana law does not distinguish between causes of action for inverse condemnation and expropriation, relying on State, Through Department of Transportation and Development v. Chambers, 91-1202 (La.3/2/92); 595 So.2d 598. With this conclusion, I respectfully disagree. Louisiana law distinguishes between causes of action for inverse condemnation and expropriation. In Chambers, the Louisiana Supreme Court recognized this distinction and stated "The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced." supra, at 602. The cases relied upon by the majority and concurring opinions involve expropriations and do not involve the issue central to this litigation, whether the state subjected the leaseholders' property to a constitutional taking. Moreover, expropriation proceedings, unlike inverse condemnation actions, are governed by LSA-R.S. 19:1, et seq.
Furthermore, the majority and concurring opinions rely upon State Through Department of Highways v. Vermilion Development Co., 258 La. 1159, 249 So.2d 167 (La.1971), for the principle that knowledge of an expropriation does not bar a claim for compensation, in the absence of bad faith. We are not confronted with the *15 issue of appropriate compensation in this appeal. In this inverse condemnation action, we are asked to consider whether the leaseholders' property has been subjected to a constitutional taking. Whether knowledge of an expropriation bars compensation was not the issue addressed by the federal court in this litigation. Unless and until a constitutional taking is established, the issue of compensation should not be addressed. Chambers, supra at 603.
For the above reasons, I dissent from the opinion on rehearing.
GULOTTA, J., respectfully dissents for the reasons assigned by Judge MIRIAM WALTZER.
NOTES
[1] Avenal v. United States, 33 Fed. Cl. 778 (1995).
[2] Avenal v. United States, 100 F.3d 933 (5th Cir.1996).
[3] Respondents rely on several expropriation cases to argue that the legal standard applicable to the facts in this state proceeding differs from the legal standard applicable in the federal proceeding. Expropriation proceedings are governed by LSA-R.S. 19:1, et seq. These statutes do not govern claims for inverse condemnation.
[1] 33 Fed. Cl. 778 (1995)
[2] 100 F.3d 933 (Fed.Cir.1996)